1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANE LORENZE HUSTED,<br><br>                          Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>                          Defendant. | Case No.:  15-cv-1689-BEN (KSC)<br><br>**ORDER:**<br><br>**(1) GRANTING PLAINTIFF'S<br>MOTION FOR SUMMARY<br>JUDGMENT [Doc. No. 9];**<br><br>**(2) DENYING DEFENDANT'S<br>CROSS-MOTION FOR SUMMARY<br>JUDGMENT [Doc. No. 14]; and**<br><br>**(3) REMANDING THE CASE TO<br>THE COMMISSIONER** |

Pursuant to Title 42, United States Code, section 405(g), of the Social Security Act ("SSA"), Plaintiff Shane Lorenze Husted filed a Complaint to obtain judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying him disability insurance benefits.[1]  [Doc. No. 1.]

---

[1]     Title 42, United States Code, section 405(g), provides as follows:  "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . .

1

Presently before the Court are: (1) Plaintiff's Motion for Summary Judgment [Doc. No. 9]; (2) Defendant's Cross-Motion for Summary Judgment [Doc. No. 14]; (3) Defendant's Opposition to Plaintiff's Motion for Summary Judgment [Doc. No. 15]; and (5) the Administrative Record ("AR") [Doc. No. 7]. Plaintiff did not file a response to Defendant's Motion or a reply to Defendant's Opposition.

After careful consideration of the moving and opposing papers, as well as the Administrative Record and the applicable law, the Court finds that Plaintiff's Motion for Summary Judgment must be **GRANTED** [Doc. No. 9], Defendant's Cross-Motion for Summary Judgment must be **DENIED** [Doc. No. 14], and the case must be remanded to the Commissioner for further proceedings.

## I. *Background and Procedural History.*

On April 17, 2012, Plaintiff submitted an application for disability insurance benefits claiming he was unable to work as of March 2, 2009 because of the following medical conditions: back disc replacement; neuropathy; chronic pain; and depression. [AR 55-56, 149-152, 169-177.]

On September 6, 2012, Plaintiff was notified that his application had been reviewed but he did not qualify for disability benefits because his health problems were not severe enough to prevent him from working. [AR 83-86.] Plaintiff requested reconsideration of this decision, but his request for benefits was denied once again on February 26, 2013. [AR 89-93.] On March 5, 2013, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR 95.] A hearing was held on November 25, 2013. [AR 31.]

On January 17, 2014, the ALJ concluded that Plaintiff was not disabled within the

---

brought in the district court of the United States. . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).

meaning of the SSA and did not qualify for disability insurance benefits.  [AR 14-25.]
Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR 12.]  On
May 29, 2015, the Appeals Council denied review of the ALJ's decision.  [AR 1-3.]  If
the Appeals Council denies review, the decision of the ALJ becomes the final decision of
the Commissioner.  20 C.F.R. § 404.981.  The Complaint in this action was then filed on
July 30, 2015 seeking review of the Commissioner's final decision.  [Doc. No. 1.]

     Plaintiff's Motion for Summary Judgment challenges the decision of the ALJ to
deny his application for disability insurance benefits under the SSA.  Plaintiff argues that
substantial evidence does not support the ALJ's conclusion that he has the residual
functional capacity for light work that is available in significant numbers in the national
economy.  As a result, Plaintiff argues that this Court should grant his Motion for
Summary Judgment and remand the case back to the Commissioner for further
proceedings.  [Doc. No. 9-1 at 7-15.]  Defendant argues that this Court should affirm the
ALJ's decision because it is supported by substantial evidence and is free from legal
error.  [Doc. Nos. 14, 15.]

## II.    *Standards of Review.*

     The final decision of the Commissioner must be affirmed if it is supported by
substantial evidence and if the Commissioner has applied the correct legal standards.
*Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  Under the
substantial evidence standard, the Commissioner's findings are upheld if supported by
inferences reasonably drawn from the record.  *Id.*  If there is evidence in the record to
support more than one rational interpretation, the District Court must defer to the
Commissioner's decision.  *Id.*  "Substantial evidence means such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."  *Osenbrock v. Apfel*,
240 F.3d 1157, 1162 (9th Cir. 2001).  "In determining whether the Commissioner's
findings are supported by substantial evidence, we must consider the evidence as a
whole, weighing both the evidence that supports and the evidence that detracts from the
Commissioner's conclusion."  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment motions, as defined by Fed. R. Civ. P. 56, contemplate the use of evidentiary material in the form of affidavits, depositions, answers to interrogatories, and admissions." *Kenney v. Heckler*, 577 F. Supp. 214, 216 (N.D. Ohio 1983). In Social Security appeals, however, the Court may "look no further than the pleadings and the transcript of the record before the agency," and may not admit additional evidence. *Morton v. Califano*, 481 F. Supp. 908, 914 n.2 (E.D. Tenn. 1978); 42 U.S.C. § 405(g). "[A]lthough summary judgment motions are customarily used [in social security cases], and even requested by the Court or Magistrate, such motions merely serve as vehicles for briefing the parties' positions, and are not a prerequisite to the Court's reaching a decision on the merits." *Kenney*, 577 F. Supp. at 216.

**III.** **_Evidence in the Administrative Record._**

    **A.** **_Education, Work History, and Medical Information Included in Plaintiff's Application and Related Forms._**

On July 30, 2012, Plaintiff completed two forms to support his application: (1) a Function Report; and (2) a Work History. In the Function Report, Plaintiff stated that he lived with his wife and two children. During the day, he took care of his newborn child. However, his mother helped to care for the child when his pain was too bad. He complained that he was unable to sleep or get comfortable and that he needed help with his shoes. However, he was able to prepare simple meals, do chores such as laundry and dishes for about a half hour each day, drive, and shop for food once or twice a month. He did not feel motivated to go out because of pain and was unable to do any yard work. Most of his time on a daily basis was spent watching television, watching his son at sports events, going to doctors, playing board games, and talking. However, any bending of his back caused pain and he had problems lifting, squatting, bending, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and concentrating. He could

walk 15 or 20 minutes without resting.  Plaintiff represented that he does not always finish things he starts because his pain gets too bad.  In addition, his condition causes him to be short tempered, frustrated, and depressed and he no longer wants to be around people.  [AR 191-98.]  On the Work History form, Plaintiff stated that he worked for about eleven years as a fabricator and construction worker.  [AR 202-09.]

Plaintiff's wife also completed a Function Report form on July 31, 2012.  [AR 212-19.]  Her responses were very similar to Plaintiff's responses.  She indicated that Plaintiff has trouble sleeping, is in a lot of pain, and spends a good deal of time watching television.  [AR 212-19.]  He takes a ten-minute walk every morning [AR 212]; occasionally does dishes and makes dinner [AR 214]; drives a car; shops for food twice a month for thirty to forty-five minutes at a time [AR 215]; and sits or stands once a week to watch his son race at track meets [AR 216].  He is unable to do any yard work because it causes too much pain.  [AR 215.]  Plaintiff's wife also stated that he is irritated and short tempered because of his pain.  [AR 217-18.]

About six months later, on January 19, 2013, Plaintiff's wife completed a second Function Report.  [AR 258-66.]  This time she indicated Plaintiff's pain had gotten worse and he was unable to sleep even with the help of sleeping pills.  He had been told he needed another surgery.  [AR 258-59.]  He was mostly watching television; could only stand long enough to prepare quick meals in the microwave; and was unable to bend, lift, or squat.  The family had taken over all of his chores.  Once a week, Plaintiff was able to go to his son's soccer game for an hour but he had to change positions frequently because of pain.  [AR 260-62.]  His mood was "extremely grouchy," angry, and irritable because of "severe pain."  [AR 263-65.]

### B.   *Chronological Summary of Medical Records*.

Medical records from early 2010 indicate that Plaintiff felt sharp pain in his low back on March 2, 2009 while "prying down on a piece of wood" during "customary work activities."  [AR 779.]  An MRI study completed on March 18, 2009 was interpreted as "normal."  [AR 779.]  Later, it was determined that there was "degenerative disc disease

at the L5-S1 level." [AR 706, 709.] Plaintiff remained symptomatic and was referred to a spine specialist for evaluation and treatment. Epidural steroid injections and other treatments were provided but did not result in any significant relief. [AR 780, 730, 723, 719.] Plaintiff was also taking Vicodin, Tylenol, and a muscle relaxer for pain. [AR 780.] Surgical intervention was then recommended. [AR 780, 779-86, 774-77, 712.] On October 5, 2010, Plaintiff had surgery to replace his L5-S1 disc. [AR 318.] "The surgery went well without complications," and he was discharged on October 7, 2010 with oral medications for pain. [AR 318-25.]

Neil A. Tayyab, M.D., an orthopedic specialist and Plaintiff's primary treating physician, examined Plaintiff on October 14, 2010, about one week after his disc replacement surgery. At this time, Dr. Tayyab reported that Plaintiff was "doing well." [AR 641.] The severe lower back pain he had prior to surgery had "resolved" and he had no pain in his legs. [AR 641.] Dr. Tayyab refilled a prescription for pain medication and recommended that Plaintiff start physical therapy. [AR 641.] On November 18, 2010, Dr. Tayyab reported x-rays had been taken showing that there was "good movement of the lumbar spine" and that the prosthesis was "in a satisfactory position." [AR 638-39.]

Plaintiff had a follow-up visit with Dr. Tayyab on January 10, 2011, and the progress notes indicate Plaintiff had been doing "quite well" until he injured himself while doing some core strengthening on a ball. [AR 632.] He began having "significant achy left lower extremity pain." [AR 632.] He reported taking one to two tablets of Vicodin per day, "which [did] seem to improve his symptoms." [AR 632.] Dr. Tayyab requested six more physical therapy sessions and gave Plaintiff prescriptions for Vicodin, Naproxen, and Flexeril. [AR 633.]

As of January 31, 2011, Dr. Tayyab reported that Plaintiff had completed fourteen sessions of physical therapy and his pain was improving despite "a setback a few weeks ago." [AR 628-29.] At this time, Plaintiff continued to take Vicodin and Flexeril for back pain. [AR 628.] Plaintiff also complained of "left lower extremity pain." [AR 628.] Dr. Tayyab requested ten additional sessions of physical therapy and added a

prescription for Neurontin to address Plaintiff's leg symptoms.  [AR 629.]

Dr. Tayyab prepared a progress report on February 28, 2011 stating that Plaintiff's pain was improving, but "he still ha[d] pain localized to his right upper buttock."  [AR 381.]  Dr. Tayyab recommended a functional capacity evaluation to determine any work restrictions and a "work hardening program" to help him get back to gainful employment. [AR 382.]  Dr. Tayyab gave Plaintiff a prescription for 800 mg of Motrin to address his pain in place of Neurontin, which made him feel lethargic.  His request for additional physical therapy was denied because Plaintiff had already had twenty-six sessions of therapy.  [AR 382.]

On March 28, 2011, Dr. Tayyab expressed concern because Plaintiff was still having "significant pain in his right buttock region" and reported feeling "depressed and frustrated" because he was still unable to work.  Plaintiff appeared to be "in a mild amount of distress."  [AR 378.]  Dr. Tayyab recommended an MRI; an epidural injection "to calm down the nerve root;" and consultation with a psychologist to address Plaintiff's "significant symptoms of depression."  [AR 378.]  At this time, Plaintiff's range of motion was "stable."  [AR 378.]  Although he had tenderness and a mild spasm in his "right gluteal region," he had "full motor and sensation in his bilateral lower extremities" and "no gross sensory deficits."  [AR 378.]

Thomas D. Harpley, Ph.D., a clinical psychologist, evaluated Plaintiff on April 26, and 28, 2011.  Dr. Harpley also reviewed Plaintiff's medical records.  [AR 409.]  During the evaluation, Plaintiff reported anxiety, irritability, difficulty sleeping "due to intrusive and racing thoughts," sadness, hopelessness, and concern about his ability to return to work. [AR 414.]  On a typical day, Plaintiff indicated he made breakfast, took his son to school, exercised, made a light lunch, and read until 3:00 p.m.  He then picked his son up from school and took him to the track for training until 7:00 p.m.  His wife had dinner prepared when he returned home, and he spent time with her before going to bed between 9:00 p.m. and 10:00 p.m.  He generally woke up after about two hours of sleep because of pain and stress.  [AR 414.]  Dr. Harpley noted that Plaintiff's concentration was

"noticeably impaired." [AR 415.]

As part of his evaluation, Dr. Harpley administered psychological testing. [AR 412.] The test results fell within the "severe" ranges for depression and anxiety. [AR 412-13.] However, an interpretative report indicated Plaintiff "responded to the test items in an exaggerated manner, endorsing a wide variety of inconsistent symptoms and attitudes." [AR 413.] In this regard, the interpretative report stated: "These results may stem from a number of factors that include random responding, falsely claiming psychological problems, low reading level, a 'plea for help,' or a confused state." [AR 413.]

In his written report, Dr. Harpley provided the following additional information regarding the results of the psychological testing: "During the clinical interview, [Plaintiff] reported that he has been diagnosed with a learning disorder which affects his reading and spelling. In a follow-up telephone conversation, [Plaintiff] told [Dr. Harpley] that he has been opined to suffer from dyslexia." [AR 413.] Dr. Harpley acknowledged that the results of the psychological testing were "invalid due to a number of possibilities." [AR 415.] On the other hand, Dr. Harpley noted there was "no evidence of malingering, faking or deceiving." [AR 415.] In addition, Dr. Harpley stated that Plaintiff's dyslexia, "a learning disorder involving both reading and written expression," would "mitigate the results of a paper and pencil psychological test." [AR 415.] Therefore, in assessing Plaintiff's mental health, Dr. Harpley relied more heavily on Plaintiff's personal and vocational history, his clinical presentation, and his own clinical judgment. [AR 415.]

Essentially, Dr. Harpley concluded that Plaintiff suffered from anxiety and a depressed mood reasonably and plausibly caused by his emotional response to his back injury, medical situation, and chronic pain. [AR 416-18.] Dr. Harpley recommended cognitive behavioral pain management therapy and an evaluation by a psychiatrist to determine whether medication would be beneficial. [AR 418.] Finally, Dr. Harpley concluded that Plaintiff's emotional condition at the time was "consistent with a

temporary partial psychological disability."  [AR 418.]

By his next appointment with Dr. Tayyab on May 2, 2011, Plaintiff continued to complain of pain in his low back and buttock region and "significant muscle spasm." [AR 375.]  Although an MRI did not show "any significant pressure on the nerve roots," Dr. Tayyab reported it was possible that Plaintiff had "nerve root irritation."  [AR 375, 329.]  Dr. Tayyab recommended twelve sessions of acupuncture and decided to hold off on a "work hardening program" until Plaintiff's pain improved.  [AR 375.]

In his June 13, 2011 progress report, Dr. Tayyab reported that Plaintiff's low back and buttock pain improved with acupuncture treatments.  His mood was also improving significantly with visits to a psychologist, and he reported he was able to sleep at night. [AR 371.]  Dr. Tayyab recommended continuing these treatments.  At this time, he believed Plaintiff was capable of sedentary work with restrictions (no lifting over five pounds and no pulling or pushing).  [AR 372.]

On June 24, 2011, Plaintiff was evaluated by James E. McSweeney, M.D., an orthopedic specialist.  [AR 803.]  It was Dr. McSweeney's opinion that Plaintiff remained "significantly symptomatic" and his body posture was indicative of "severe splinting due to pain."  [AR 811.]  Dr. McSweeney recommended additional testing but indicated it was possible Plaintiff would need "a lumbar fusion at L5-S1 in the future."  [AR 811.]

Plaintiff reported increased pain to Dr. Tayyab on July 11, 2011 "due to the fact that he [was] taking care of his newborn baby."  [AR 366.]  Dr. Tayyab recommended that Plaintiff continue acupuncture treatments and have a CT myelogram study.[2]  Plaintiff was "cleared for sedentary work" with restrictions.  [AR 366-67.]

On July 25, 2011, after reviewing Plaintiff's medical records and the May 13, 2011 evaluation prepared by Dr. Harpley, Dr. Daniel Gardner, M.D., a psychiatrist, had an

---

[2]     A "myelography" is a "radiographic visualization of the spinal cord after injection of a contrast medium into the spinal subarachnoid space."  Medical Dictionary, http://www.merriam-webster.com (Aug. 2, 2016).

eighty-minute office consultation with Plaintiff and prepared a written report.  [AR 291-97.]  According to Dr. Gardner, the purpose of the consultation was to "determine whether medication treatment [was] indicated."  [AR 294.]  At the time of this consultation, Plaintiff was stretching and exercising daily at the gym and was not receiving any formal physical therapy.  [AR 294.]  Plaintiff was also "taking primary responsibility" for the care of his seven-week-old son.  About two weeks prior to the consultation, Plaintiff resumed taking Vicodin twice daily because of his concern "about the added stress of bending and lifting the infant."  [AR 294-95.]  He complained that he was "quick-tempered," frustrated, and unable to sleep well "due to intrusive and racing thoughts."  [AR 294.]  He reported "dwelling on things excessively."  [AR 294.]  Dr. Gardner concluded that Plaintiff was experiencing depression and anxiety caused by "continuing pain" and recommended that he begin taking 25 mg of Zoloft, an anti-depressant medication, and 5 mg of Ambien, as needed, to address insomnia.  [AR 295-97, 302.]  Dr. Gardner expected to meet monthly with Plaintiff "for the next 6 months, then less frequently, depending on the status of his pain."  [AR 297.]

On August 1, 2011, Plaintiff reported to Dr. Gardner that the medications were "working great" and he felt more relaxed.  [AR 299.]  On August 23, 2011, Plaintiff indicated he was "[m]uch less stressed" and "less short-tempered," but he was still waking up at night because of pain and insomnia.  Dr. Gardner increased Plaintiff's prescriptions for Zoloft to 50 mg and Ambien to 12.5 mg "in order to achieve uninterrupted sleep."  [AR 303.]

Although Plaintiff reported to Dr. Tayyab on August 8, 2011 that his pain was improving somewhat, he said he was hearing a "clunking sound in his low back with certain movements."  [AR 364.]  A "left L5 selective nerve root injection" and "bilateral L5-S1 facet blocks" were recommended and authorized.  [AR 365.]

On September 8, 2011, Dr. Tayyab was able to hear an "audible clunk which appear[ed] to be from the disc replacement," but x-rays did not show "an abnormality of the position of the disc replacement or any other issues with the disc replacement."  [AR

362.]  Dr. Tayyab stated he would discuss this with the disc manufacturer.  [AR 362.]

On September 27, 2011, Plaintiff reported increased pain and irritability due to medical testing (*i.e.*, a myelogram of his spinal canal) and was advised to continue taking 50 mg of Zoloft for one week and then increase it to 100 mg if his mood did not improve. [AR 304-05.]

On October 3, 2011, Plaintiff reported "almost complete relief of symptoms" on his left side after receiving a "left L5-S1 facet block."  [AR 358.]  However, he continued to have "right-sided low back pain."  [AR 358.]  Dr. Tayyab recommended "a right L5-S1 facet block."  [AR 359.]  At this time, Plaintiff remained clear to perform sedentary work.  [AR 359.]

In his progress notes from December 5, 2011, Dr. Tayyab noted Plaintiff continued to have low back pain, bilateral buttock pain, and an "audible clunk" where the disc was replaced.  He expressed concern about the denial of a "facet block" treatment by Plaintiff's insurer.  Dr. Tayyab recommended a second opinion and indicated he believed Plaintiff would eventually need to have the disc replacement removed and undergo a "fusion at the L5-S1 level."  [AR 352-56.]

In a progress report dated October 22, 2011, Dr. Harpley stated that he had been meeting with Plaintiff regularly since April 2011 for cognitive behavioral pain management treatment.  [AR 403-04.]  Although Dr. Harpley reported that Plaintiff had responded well to counseling and medication, he still had a need for additional therapy, because he continued to suffer from chronic pain.  In addition, he had recently complained of increased pain, irritability, and depression because of "painful injections" while undergoing diagnostic testing.  [AR 405.]  He also told Dr. Harpley that his chronic pain and irritability were adversely affecting his marital relationship and his parenting responsibilities.  [AR 405.]  Dr. Harpley recommended another three months of treatment.  [AR 406.]

Progress notes by Dr. Gardner dated December 16, 2011 state that Plaintiff reduced his dosage of Zoloft to 25 mg "to make the supply last" but was only sleeping

four hours and was feeling more "stressed," worried, and tired.  [AR 309.]  His insurance was "denying many of his therapies" and he had continuing financial concerns.  [AR 309-10.]  He had also been told it would take a year to obtain authorization for additional surgery and another year for recovery but there was a chance he would not improve.  [AR 309.]  Plaintiff was instructed to increase the dosage of his Zoloft to 50 mg.  [AR 310.]

On January 16, 2012, Plaintiff reported increased pain to Dr. Tayyab and was given a prescription for Vicodin.  Dr. Tayyab's progress notes for this date state that "[t]he Vicodin does control his pain," and he was cleared to perform sedentary work.  [AR 349-50.]  Dr. Tayyab's notes indicate that Plaintiff was scheduled to meet with Larry Dodge, M.D., on January 18, 2012 for a second opinion.  [AR 349.]  A lengthy report by Dr. Dodge indicated it was "reasonable" for Dr. Tayyab to pursue additional surgical intervention "if [Plaintiff] so desires," but he expressed concern about the "significant risk" involved in the recommended surgery.  [AR 742, 755-56.]

Plaintiff reported to Dr. Gardner on January 17, 2012 that he "had a great Christmas," and his mood had initially improved when he increased the dosage of his Zoloft.  However, he became more anxious after a medical appointment with Dr. Tayyab, who recommended "fusion" surgery.  [AR 311.]  Thereafter, he had a "pounding heart" and only slept for four hours.  He felt "stress[ed] out" and impatient "due to [the] possibility of needing [a] second back surgery," and, as a result, he and his wife decided to put their infant son in day care.  [AR 311.]  Plaintiff reported that his pain was "5/10," but it was "8/10" the day before because he had gotten out of the car the wrong way.  Dr. Gardner did not make any adjustments to Plaintiff's medications.  [AR 311.]

On February 9, 2012, Dr. Harpley reported that Plaintiff was emotionally distressed about having to undergo another surgery and post-operative recovery.  He was also concerned because his "pain-related irritability" was adversely affecting his marriage and family relationships.  [AR 398-400.]  He had developed a tendency to withdraw from his family.  In addition, Plaintiff was very concerned about the financial impact of his prolonged disability.  [AR 400.]  As a result, Dr. Harpley recommended an additional

four months of cognitive behavioral pain management treatment.  [AR 401.]

Dr. Tayyab's progress notes from February 27, 2012 state that Dr. Dodge and Dr. Scott Leary, another doctor visited by Plaintiff, had agreed with his recommendation for additional surgery.  Dr. Tayyab's recommendation was to perform "an L5-S1 anterior lumbar interbody fusion."  [AR 348.]  Because the surgery is "associated with major risks and possible complications," Dr. Tayyab indicated Plaintiff was going to think about whether he would like to proceed with the surgery or delay it.  [AR 348.]  Plaintiff continued to be cleared for sedentary work.  [AR 348.]

At the time of his appointment with Dr. Gardner on March 20, 2012, Plaintiff's dosage of Zoloft had been increased to 100 mg but he had stopped taking it for a week "for an unclear reason—he thinks he ran out, and it was too inconvenient to pick them up."  [AR 313.]  After a week, he felt "more irritable and angry," but he felt better when he resumed his regular dosage of Zoloft.  Plaintiff told Dr. Gardner he had decided to delay having surgery "since the procedure is new."  [AR 313.]  In the meantime, no treatment was available to him, and the disc was getting worse because it was slipping to the side and causing pain in both of his legs.  [AR 313.]  Dr. Gardner did not make any adjustments to Plaintiff's medication because he had a "stable mood with Zoloft 100 mg."  [AR 313.]

On April 9, 2012, Dr. Tayyab reported that Plaintiff had "reached maximal medical improvement" and "a permanent and stationary status with regards to his lumbar spine" pending "further surgical treatment."  [AR 342.]  Plaintiff's main complaints at this time were low back pain and an audible clunking sound.  He also continued to take Ambien and Zoloft for treatment of depression and insomnia.  As a result of these medications, Plaintiff's mood had "stabilized significantly" and his sleeping patterns [had] improved."  [AR 341, 344.]  Plaintiff decided he did not wish to proceed with further surgical treatment at this time.  For pain, Plaintiff was taking Tylenol and Vicodin.  He only took Vicodin on "days of severe pain" but this was not very often.  [AR 341-42, 344.]  According to Dr. Tayyab, Plaintiff had resumed many but not all of his normal activities.

[AR 342.]  Although it was Dr. Tayyab's opinion that Plaintiff was "totally disabled at this time" because he was unable to return to his work in construction, he recommended vocational retraining.  [AR 343.]

In a report dated May 21, 2012, Dr. Harpley said Plaintiff's "emotional condition" had been "relatively stable" for some time pending medical developments that were unlikely to change in the near future.  At this time, Plaintiff's low back pain was reportedly "constant" and he continued to complain of irritability, anxiety, depression diminished self-esteem and self-confidence, and social withdrawal.  [AR 393-94.] However, it was Dr. Harpley's opinion that Plaintiff's "psychological condition, *per se*, [did] not necessitate any formal work restrictions."  [AR 394.]  Rather, it was Dr. Harpley's opinion that Plaintiff was "generally functioning pretty well."  [AR 394.] However, he had a range of mild symptoms that indicated some difficulty in social and occupational functioning, but these symptoms did not preclude him from returning to work.  [AR 394-95.]  Dr. Harpley recommended continued psychological treatment for an additional twelve months to help Plaintiff cope with continued "daily stressors," prevent aggravation or relapse, and provide support if he decided to undergo additional surgery.  [AR 395-96.]

On June 19, 2012, Plaintiff reported to Dr. Gardner that he had increased stress resulting in "impatience and irritability."  [AR 314.]  During the night, he was waking up and was unable to go back to sleep because of back pain and financial concerns.  He could not afford surgery and the surgeon could not guarantee that surgery would reduce his pain.  Plaintiff told Dr. Gardner that he "[t]ries to keep it inside, then he 'blows up.'" [AR 314.]  At this time, Plaintiff was taking care of his one-year-old child because day care was unaffordable.  Dr. Gardner increased Plaintiff's dosage of Zoloft to 150 mg and to 200 mg if needed.  [AR 314.]

On September 25, 2012, Plaintiff reported increased pain to Dr. Gardner in his left leg and sharp pain on the side of his groin.  He said he was requesting authorization for surgery from his insurance carrier but also said he could not afford surgery because of

child care issues.  Dr. Gardner noted that Plaintiff's "mood improved on Zoloft," and he therefore prescribed a continued dosage of 150 mg.  [AR 572.]

On November 2, 2012, Plaintiff had a "Qualified Medical Re-evaluation" by James E. McSweeney, M.D., an orthopedic specialist.  [AR 433.]  At this time, Plaintiff's chief complaints were constant pain in his low back; cramping in his left knee and calf; sleep disturbance; and worsening pain with prolonged sitting, standing, and walking. [AR 434.]  An examination revealed an abnormal gait and a limited range of motion, but many findings, such as Plaintiff's muscle strength, were within normal ranges.  [AR 447-50.]  Dr. McSweeney indicated Plaintiff's symptoms, medical records, and the results of his physical examination were consistent with the mechanics of his injury.  [AR 450.]  In part, Dr. McSweeney's report states as follows:

> Certainly I would concur with the patient that his symptoms are relatively manageable with the use of activity modification and medications.  Additional operative management should be withheld until symptoms worsen to the point that his function is significantly deteriorated.

> Currently the patient is rather functional, but does have residual pain/ impairment relative to the lumbar spine.  I do not believe surgery is necessary at this time.  Since a significant change in his condition is not anticipated with or without medical treatment over the next few months (in the absence of surgery), he should be considered permanent and stationary for rating purposes.

[AR 450.]

Dr. McSweeney also concluded that permanent work restrictions were appropriate. Because of his residual symptoms, Dr. McSweeney stated that Plaintiff should be "limited with regards to bending, stooping or twisting.  He should not perform any lifting greater than 20 pounds and should not perform any prolonged sitting, standing and/or walking."  [AR 451.]  In addition, it was Dr. McSweeney's opinion that Plaintiff should have access to continuing pain treatment for "flare-ups in the future."  [AR 452.]

In progress notes dated January 3, 2013, Dr. Gardner reported that Plaintiff became more irritable and anxious when he ran out of Zoloft and Ambien.  While taking Zoloft,

Plaintiff said he was calmer, more able to tolerate the commotion of his children, and could listen and concentrate better.  During the day, Plaintiff was watching television, tinkering in the garage, and taking care of his toddler.  [AR 483.]  Dr. Gardner concluded that Plaintiff's mood and sleep were "well-managed" with Zoloft and Ambien.  [AR 484.]

On April 5, 2013, Plaintiff returned to Dr. Gardner for follow-up treatment of depression.  Because of chronic back pain, Plaintiff indicated he intended to have the recommended surgery.  [AR 567.]  Dr. Gardner continued Plaintiff's prescription for Zoloft because his mood was better while he was taking this medication.  [AR 567.]

At another follow-up appointment with Dr. Gardner on July 15, 2013, Plaintiff reported difficulty sleeping.  His prescription for Ambien was no longer effective.  However, the Zoloft was helping him to be "mellow around [his] kids" with "[n]o ups and downs."  [AR 568.]  He also reported more pain "due to increased activity."  [AR 568-69.]  Dr. Gardner changed Plaintiff's sleep medication from Ambien to Lunesta.  [AR 569.]

On October 7, 2013, Dr. Gardner reported that Plaintiff's mood was "lower because of increased back pain" for the past two weeks.  [AR 865-66.]  He was waking up in the middle of the night because of pain.  His wife had gone back to her teaching job at the end of the summer, so he had the primary responsibility for the children, who were eleven and two years of age.  Plaintiff was "stressed by increased back pain" and concerned "about getting disability so he [could] afford child care in order to get surgery."  [AR 865-66.]  Dr. Gardner continued Plaintiff's medications.  [AR 866.]

### C.   *Hearing Testimony*.

#### 1.   *Plaintiff*.

At the hearing on November 25, 2013, Plaintiff testified that he was not working.  He testified that he previously worked in construction but had not worked since March 2, 2009.  He stopped working because of a work-related accident during which he "jarred" his back "really bad" while prying some wood from a building.  [AR 34.]

At the time of the hearing, Plaintiff was thirty-six years old.  [AR 35.]  He had a high school education and could read and write.  [AR 35.]  His worker's compensation case was "still open."  [AR 34.]

Plaintiff testified that he had disc replacement surgery in October 2010 and was then re-injured in January 2011 during physical therapy.  [AR 35-36.]  Physical therapy was discontinued to allow the injury to heal.  However, when he returned to physical therapy he was unable to participate because it was "just too physically intense" for him.  [AR 36.]  Except for "another surgery," Plaintiff had tried other treatments made available to him, including injections and acupuncture.  [AR 36.]

Plaintiff explained that the replacement disc inserted during the surgery is "supposed to be fused to [his] bones." [AR 37.]  However, the disc moves "back and forth" and makes a "clunking" noise in his hips when he walks or moves his legs and causes "[a] lot of pain."  [AR 37.]  His medications for pain include Vicodin, Ibuprofen, Tylenol, and Flexeril.  [AR 38.]

About a year prior to the hearing, Plaintiff said his workmen's compensation doctors discussed a "second surgery" with him.  [AR 38.]  According to Plaintiff, the artificial disc that was placed in his back during the first surgery was a "prototype" that "failed."  [AR 38.]  Plaintiff testified he was the first one in San Diego to have this disc placed in his back and the disc had only been used three other times.  Plaintiff decided to wait and not have a second surgery until the doctors had more experience with the disc.  His three doctors have said the disc "needs to be pulled out," but "it's scary," and he does not want to be a "guinea pig."  [AR 38-39.]  As of April 2012, his status was "permanent temporary disabled."  [AR 39.]

During the day, Plaintiff testified that he watches television but must change positions regularly about every five to forty minutes to relieve pain depending on the medication he takes.  [AR 40.]  The medications make him "very sleepy."  [AR 41.]  They also make it difficult for him to handle his family.  Everyone says he is "very irritated."  [AR 41.]

Plaintiff has two children who are two and eleven years old.  [AR 41.]  His youngest son was born about the time he started having problems with his back, and it has always been difficult for Plaintiff to lift his son.  [AR 41.]  Although he is able to shower and put shirts on, he has trouble with his pants, and his eleven-year-old son helps him with his shoes.  [AR 42.]  When he bends over, it is painful to pull himself back up.  [AR 42.]

Plaintiff has also been seeing a therapist who treats him for depression and insomnia, and he is taking medications.  [AR 42.]  His pain makes it difficult for him to go anywhere to spend time with his family.  He drives sometimes and takes his son to school about twice a week.  [AR 43.]  In the morning, Plaintiff prepares breakfast.  [AR 44.]  For a short time, Plaintiff was taking care of his youngest son during the day while his wife was at work as a teacher.  However, this was too much for Plaintiff, so they put his son in daycare.  When they could no longer afford daycare, Plaintiff's mother began watching him at her house.  [AR 45.]  Plaintiff sometimes uses a computer to look at the news but mostly watches television.  He does not do any yard work, chores, or grocery shopping.  [AR 46-47.]

### 2. *Vocational Expert.*

Sandra Fioretti, a vocational expert, also testified at the hearing.  Prior to her testimony, she asked Plaintiff some clarifying questions on the record about his prior work in construction.  [AR 31-32, 48.]  Plaintiff responded that when he worked as a fabricator he read blue prints and built prototypes of gym equipment.  He was able to weld and do everything necessary to build the prototypes.  He was able to lift weights up to 100 pounds and had no trouble standing, walking, or sitting.  [AR 49.]  Plaintiff also explained that he held several different kinds of construction jobs and was able to do carpentry, concrete, and electrical work.  [AR 49-50.]   During this time, he could lift ninety-pound sandbags.  [AR 50.]

The vocational expert testified that Plaintiff's former jobs as a metal fabricator and construction worker were classified as heavy, skilled and/or semi-skilled work.  [AR 50.]

In response to a hypothetical, the vocational expert testified that an individual of Plaintiff's age with a high school education who previously held Plaintiff's jobs would no longer be able to perform this past relevant work if he was limited to "light work" with postural and other limitations.  [AR 50-51.]  Assuming such an individual was limited to light work with "appropriate breaks, occasional postural activities, no ladders or scaffolds, no unprotected heights or dangerous machinery," the vocational expert testified there would be a significant number of jobs available in the national economy.  Examples of available positions cited by the vocational expert included cashier, office helper, and bench assembler.  [AR 50-51.]  However, if this individual needed a ten-minute break every hour to stand and stretch in order to alleviate back pain, it would eliminate all work, because this would exceed the normally allowed breaks.  [AR 51.]  In addition, all work would be eliminated if this individual had difficulty maintaining attention and concentration.  [AR 51-52.]

When questioned by Plaintiff's counsel, the vocational expert further testified that the position of cashier would be eliminated if the above-described individual was restricted to no public interaction and only occasional interaction with coworkers and supervisors.  [AR 52.]  The cashier, office helper, and bench assembler positions would also be unavailable to an individual who had to alternate between sitting and standing every fifteen to twenty minutes.  [AR 53.]

## IV.   *The ALJ's Five-Step Disability Analysis.*

To qualify for disability benefits under the SSA, a claimant must show that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least 12 months.  42 U.S.C. § 423(d).  The Social Security regulations establish a five-step sequential evaluation for determining whether a claimant is disabled under this standard.  20 C.F.R. § 404.1520(a); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At step one, the ALJ must determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(I).  In this case, the ALJ concluded that

Plaintiff had not engaged in substantial gainful activity since March 2, 2009, the alleged onset of his claimed disability.  In addition, the ALJ concluded that Plaintiff last met the insurance status requirements of the SSA on December 31, 2013.  42 U.S.C. § 423(a)(1)(A); [AR 19.]

At step two, the ALJ must determine whether the claimant is suffering from a "severe" impairment within the meaning of Social Security regulations from the date he was last insured.  20 C.F.R. § 404.1520(a)(4)(ii).  "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  For example, a slight abnormality or combination of slight abnormalities that only have a minimal effect on the claimant's ability to perform basic work activities will not be considered a "severe" impairment.  *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  Examples of basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b)(1)-(6).  "If the ALJ finds that the claimant lacks a medically severe impairment, the ALJ must find the claimant not to be disabled."  *Webb v. Barnhart*, 433 F.3d at 686.

Here, the ALJ found at step two that, through the date of last insured, Plaintiff had the severe impairments of "degenerative disc disease of the lumbar spine and status-post disc replacement."  [AR 19.]  However, the ALJ found that Plaintiff's alleged mood disorder was not a severe impairment, because it did not cause more than minimal limitations in his ability to perform basic mental work activities.  [AR 19.]

If there is a severe impairment, the ALJ must then determine at step three whether it meets or equals one of the listings of impairments in the Social Security regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant's impairment meets or equals a listing, he or she must be found disabled.  *Id.*

1    In this case, the ALJ concluded at step three that Plaintiff does not have an

2    impairment or combination of impairments that meets or medically equals the severity of

3    one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [AR 21.]

4    If an impairment does not meet or equal a listing, the ALJ must make a step four

5    determination of the claimant's residual functional capacity based on all impairments,

6    including impairments that are not severe.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(2).

7    "Residual functional capacity" is "the most [a claimant] can still do despite [his or her]

8    limitations."  20 C.F.R. § 404.1545(a)(1).  The ALJ must determine whether the claimant

9    retains the residual functional capacity to perform his or her past relevant work.

10   20 C.F.R. § 404.1520(a)(4)(iv).   The ALJ's determination is made "based on all the

11   relevant medical and other evidence in [the claimant's] case record."  20 C.F.R.

12   § 404.1520(e).  A claimant is not disabled if he or she can still do his or her past relevant

13   work.  20 C.F.R. § 404.1520(a)(4)(iv).

14   Here, the ALJ concluded Plaintiff was unable to perform any of his past relevant

15   work as a metal fabricator or construction worker.  [AR 23-24.]  The ALJ's determination

16   in this regard is based on Plaintiff's physical limitations caused by his "severe"

17   impairments (*i.e.*, degenerative disc disease of the lumbar spine and status-post disc

18   replacement) and the testimony of the vocational expert.  [AR 21-24.]

19   If the claimant cannot perform past relevant work, at step five, the ALJ must

20   consider whether the claimant can perform any other work.  20 C.F.R.

21   § 404.1520(a)(4)(v), (g).  While the claimant carries the burden of proving eligibility at

22   steps one through four, the burden at step five rests on the agency.  *Celaya v. Halter*, 332

23   F.3d 1177, 1180 (9th Cir. 2003).  To meet this burden, the ALJ can elicit the testimony of

24   a vocational expert in response to a hypothetical that includes all of the claimant's

25   restrictions and limitations and can also reference the Medical Vocational Guidelines, 20

26   C.F.R., Part 404, Subpart P, Appendix 2.  *Tackett*, 180 F.3d at 1100-01.  The ALJ must

27   consider all of the Plaintiff's medically determinable impairments, including any pain

28   that could "cause a limitation of function" and any impairments that are not "severe," and

1   then determine the Plaintiff's residual functional capacity to perform other work in the

2   national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1545(e), 416.929.  As noted

3   above, "residual functional capacity" is "the most [a claimant] can still do despite [his or

4   her] limitations."  20 C.F.R. § 404.1545(a)(1).

5        Here, the ALJ concluded that Plaintiff retained the residual functional capacity to

6   perform light work with the following limitations:  "occasional performance of postural

7   activities; no ladders, ropes, or scaffolds; and no unprotected heights or dangerous

8   machinery."  [AR 21.]  Based on the evidence and the vocational expert's testimony, the

9   ALJ's opinion was that Plaintiff was capable of performing several representative jobs

10  that are available in the national economy.  These jobs are all considered light, unskilled

11  work and include cashier, office helper, and bench assembler.  [AR 24-25.]

12  **V.**    ***Discussion.***

13       **A.**    ***The ALJ's Mental Impairment Analysis at Step Two.***

14       At step two, the ALJ was required to consider whether Plaintiff had "a severe

15  medically determinable physical or mental impairment . . . or combination of

16  impairments."  20 C.F.R. § 404.1520(a)(4)(ii).  With respect to evaluating the severity of

17  Plaintiff's claimed mental impairment, the ALJ was required to apply "a special

18  psychiatric review technique."  *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 725

19  (9th Cir. 2011) (citing 20 C.F.R. § 404.1520a).  "An ALJ's failure to comply with 20

20  C.F.R. § 404.1520a is not harmless if the claimant has a colorable claim of mental

21  impairment."  *Id.* at 726.

22       Specifically, section 404.1520a first requires the ALJ to evaluate the claimant's

23  symptoms, signs, and laboratory findings to determine whether the claimant has a

24  "medically determinable impairment."  20 C.F.R. § 404.1520a(b)(1).  The ALJ must then

25  "rate the degree of functional limitation resulting from the impairment(s)."  20 C.F.R.

26  § 404.1520a(b)(2).  The claimant's "degree of functional limitation" is rated in the

27  following "four broad functional areas":  "Activities of daily living; social functioning;

28  concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R.

§ 404.1520a(c)(3).  Degrees of limitation in the first three categories are rated on a five-point scale:  "None, mild, moderate, marked, and extreme."  20 C.F.R. § 404.1520a(c)(4).  A numerical scale of none to four or more is used to rate the degree of limitation in the fifth category, episodes of decompensation.  20 C.F.R. § 404.1520a(c)(4).  If the degree of limitation in the first three functional areas is determined to be "none" or "mild," the ALJ will generally find that the claimant's mental impairment is "not severe."  20 C.F.R. § 404.1520a(d)(1).  "The decision must include a specific finding as to the degree of limitation in each of the functional areas" described above.  20 C.F.R. § 404.1520a(e)(4).

As noted above, the ALJ concluded at step two that Plaintiff had the "severe" impairments of "degenerative disc disease of the lumbar spine and status-post disc replacement."  [AR 19.]  However, the ALJ concluded that Plaintiff's "medically determinable alleged mood disorder impairment did not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and was therefore nonsevere."  [AR 19.]  With respect to activities of daily living; social functioning; and concentration, persistence, and pace, the ALJ said Plaintiff only had "mild limitations."  [AR 20.]  The ALJ also concluded there was no evidence of any episodes of decompensation.  [AR 20.]

In his Motion for Summary Judgment, Plaintiff argues that substantial evidence does not support the ALJ's step two determination for three reasons.  First, Plaintiff contends the medical evidence in the record "plainly establishes" that he has "significant functional limitations" because of his mental health problems.  [Doc. No. 9-1 at 12.]  Plaintiff argues that the record shows he has a "severe" mental impairment because the medical evidence indicates he only had the ability to perform daily activities on a "sporadic" basis and there was never a time when he was "symptom-free."  [Doc. No. 9-1 at 13.]  Plaintiff therefore believes the ALJ should have concluded at step two that he did have a "severe" mental impairment.  [Doc. No. 9-1 at 12.]

In this Court's view, Plaintiff's argument overlooks too much of the record.  When the record is viewed as a whole and in context, it is apparent that Plaintiff did have times

when he had significant mental health symptoms directly related to his back injury, back surgery, and chronic low back pain.  Understandably, Plaintiff's injury, surgery, and recovery were very stressful and did have significant adverse effects on his mental health and ability to function.  On the other hand, the record shows just as clearly that over time Plaintiff responded well to medication and therapy sessions, that his mental health symptoms improved, and that his symptoms were largely but not completely controlled with medication.  As Dr. Harpley said in his notes dated May 21, 2012, Plaintiff's "emotional condition" had been "relatively stable" for some time and he was "generally functioning pretty well."  [AR 393-95.]  Therefore, based on a thorough review of the record as a whole, this Court cannot agree with Plaintiff's contention that the medical evidence "plainly establishes" he has a "severe" mental impairment that causes more than a minimal limitation in his ability to perform work activities.  [Doc. No. 9-1 at 12.]

Second, Plaintiff also seems to argue it was not appropriate for the ALJ to consider his activities of daily living in determining whether he had a "severe" mental impairment at step two.  [Doc. No. 9-1 at 13-14.]  SSA regulations and case law do limit the use of evidence about a claimant's daily activities.  For example, when evaluating whether a claimant has engaged in substantial gainful work activity (*i.e.*, step one), it is generally not appropriate for an ALJ to "consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs."  20 C.F.R. § 404.1572(c).

On the other hand, a claimant's "daily activities" is one of the factors that may be considered by an ALJ in evaluating the credibility of a claimant's testimony about the extent of his or her pain or impairment.  *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007).  However, the ALJ may not discredit a claimant's testimony about the extent of his or her pain and impairment based solely on "daily activities, such as grocery shopping, driving a car, or limited walking for exercise."  *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).  An ALJ may reject a claimant's testimony about the extent of his or her pain or impairment if "'a claimant is able to spend a substantial part of [the] day engaged in

pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (internal citation omitted).

As noted above, SSA regulations require the ALJ to apply a "special technique" to evaluate the severity of a claimant's mental impairment.  As part of this analysis, the ALJ is required to rate the degree of limitation in the claimant's "activities of daily living." 20 C.F.R. § 404.1520a(a).  Therefore, it was appropriate for the ALJ to consider Plaintiff's activities of daily living at step two to determine whether he had a "severe" mental impairment.  For the reasons outlined above, the evidence in the record about Plaintiff's daily activities does support the ALJ's conclusion that Plaintiff's "mood disorder" or depression "did not cause more than minimal limitation in [his] ability to perform basic mental work activities and was therefore nonsevere." [AR 19.]

Third, Plaintiff contends that the ALJ's step two determination is not supported by substantial evidence because he inappropriately discredited Plaintiff's credibility based on the results of written mental status tests overseen by Dr. Harpley.  [Doc. No. 9-1 at 12; AR 20.]  As noted above, Dr. Harpley administered written psychological testing when he initially evaluated Plaintiff in April 2011.  [AR 412.]  Although the results indicated Plaintiff was severely depressed and anxious, an interpretative report indicated Plaintiff responded to the testing in an "exaggerated manner."  [AR 413.]  Dr. Harpley also indicated in his report that these results "may stem from a number of factors that include random responding, falsely claiming psychological problems, low reading level, a 'plea for help,' or a confused state."  [AR 413.]  As Plaintiff contends, it is apparent that Dr. Harpley viewed the results of the testing as invalid, probably because Plaintiff had dyslexia and not because he intentionally exaggerated his symptoms.  [AR 413-15.]  Most notably, Dr. Harpley's report states there was "no evidence of malingering, faking, or deceiving."  [AR 415.]

In support of his step two determination that Plaintiff did not have a "severe" mental impairment, the ALJ cited the results of written psychological tests administered by Dr. Harpley and indicated Plaintiff was not fully credible because he "exaggerated"

symptoms.  [AR 20.]  Under the circumstances presented, however, the cited test results are not probative evidence of Plaintiff's credibility.  The record simply does not support a finding that Plaintiff intentionally exaggerated his symptoms on the written psychological tests.  However, the ALJ's reliance on the test results at step two is harmless.  *See, e.g.*, *Keyser,* 648, F.3d at 726.  As discussed more fully below, the ALJ's decision at step two is still supported by substantial evidence in the record, even though the ALJ's partial reliance on the written test results was misplaced.

For the following reasons, it is this Court's view that substantial evidence supports the ALJ's step two determination that Plaintiff does not have a "severe" mental impairment.  First, the ALJ relied in part on Plaintiff's testimony indicating he had only "mild limitations" in his activities of daily living; social functioning; and concentration, persistence and pace.  [AR 20.]  For example, Plaintiff sometimes drove his son to school, prepared breakfast, cared for a younger child, used a computer to look at the news, and watched television.  According to the ALJ, this evidence indicated Plaintiff had the ability to "perform basic mental work activities" and was able to maintain relatively normal levels of daily activity.  [AR 20-21, 43-47.]  The ALJ noted that Plaintiff's "ability to watch television and use a computer would require him to focus long enough to track story lines and follow simple commands."  [AR 20.]  In addition, the ALJ noted Plaintiff was married and was able to maintain a stable relationship with his wife even though there were some subjective complaints of stress on the marriage attributable to Plaintiff's back impairment.  [AR 21.]

As summarized above, the ALJ's analysis about Plaintiff's ability to function is well-supported by the treatment notes kept by Dr. Gardner, who was responsible for addressing Plaintiff's mental health symptoms with medication.  For example, more recent treatment notes from January 3, 2013 indicated Plaintiff's medication helped Plaintiff to listen, concentrate, remain calm, and to be more tolerant to the commotion of his children.  [AR 483.]  During the day, Plaintiff watched television, tinkered in the

garage, and took care of his toddler.  [AR 483.]  It was Dr. Gardner's view that Plaintiff's mood and sleep were "well-managed" with medication.  [AR 484.]

Second, the ALJ relied on numerous treatment records indicating Plaintiff's depression and anxiety were "not consistently present" and improved with treatment and medication.  [AR 20.]  A review of the medical records, as summarized above, did indicate there were times when Plaintiff's symptoms were more pronounced.  For example, on June 19, 2012, Plaintiff told Dr. Gardner that he had increased stress resulting in "impatience and irritability."  [AR 314.]  He had sleep disturbance caused by back pain; financial concerns; stress caused by the possibility of a second surgery on his back; and the responsibility of taking care of his one-year-old child.  [AR 314.]  Plaintiff told Dr. Gardner he "[t]ries to keep it inside, then he 'blows up.'"  [AR 314.]  However, when viewed as a whole, Dr. Gardner's treatment notes support the ALJ's conclusion that Plaintiff's mental health symptoms improved and were well-managed with medication. As a result, the ALJ was justified in concluding that Plaintiff's mental health symptoms only resulted in "mild to no restrictions" and did not rise to the level of a "severe" mental impairment.  [AR 20.]  For example, on July 15, 2013, Plaintiff did complain of more pain "due to increased activity" and needed an adjustment of his sleep medication, but he told Dr. Gardner that his Zoloft helped him to be "mellow around [his] kids" with "[n]o ups and downs."  [AR 568.]

Third, the ALJ relied on opinions in the record of two other physicians which supported his conclusion that Plaintiff had only mild restrictions and no severe mental impairment.  [AR 20.]  Most significantly, the ALJ relied on a report dated May 21, 2012, by Plaintiff's treating psychologist, Dr. Harpley, stating that Plaintiff's "psychological condition, *per se* does not necessitate any formal work restrictions. . . .  I believe [Plaintiff] falls toward the lower end of the 61-70 range of mild symptoms indicative of some difficulty in social and occupational functioning, but generally [he is] functioning pretty well."  [AR 394.]  In this same report, Dr. Harpley reiterated:

"[Plaintiff's] psychological condition does not preclude his return to his usual and customary job."  [AR 395.]

The ALJ also cited a detailed Disability Determination/Case Analysis prepared by agency physicians on or about September 5, 2012, which was based on a review of Plaintiff's medical records.  As part of the Disability Determination/Case Analysis, the above-referenced special psychiatric review technique was applied to the information in Plaintiff's medical records.  [AR 61-62.]  Although the treatment records kept by Dr. Harpley and Dr. Gardner are more consistent with the ALJ's conclusion that Plaintiff had "mild limitations" [AR 21], the examiner(s) concluded Plaintiff had no restrictions in activities of daily living; no difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation.  [AR 62.]  As a result, the examiner(s) determined that Plaintiff had a "non-severe" mental impairment.  [AR 61-62.]  Understandably, the ALJ gave "significant weight" to the opinions of Dr. Harpley and Dr. Gardner [AR 20], because, "[a]s a general rule, more weight should be given to the opinion of a treating source."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Based on the foregoing, it is this Court's view that the ALJ was justified in concluding at step two that Plaintiff only had "mild limitations" in his mental ability to function and did not have a "severe" mental impairment.  The ALJ supported his decision in this regard with reference to substantial evidence in the record.

**B.**   ***The ALJ's Residual Functional Capacity Assessment at Steps Four and Five.***

In his Motion for Summary Judgment, Plaintiff argues that the ALJ's finding at step two that he did not have a "severe" mental impairment resulted in a further error in the ALJ's residual functional capacity assessment at steps four and five of the disability analysis.  [Doc. No. 9-1 at 5, 14.]  According to Plaintiff, the ALJ's residual functional capacity assessment does not include "all of his impairments and limitations as proven in the record."  [Doc. No. 9-1 at 14.]  In other words, the ALJ determined at step two that Plaintiff had a "medically determinable" mental health impairment that "did not cause

more than *minimal limitation*" to his ability to "perform basic mental work activities." [AR 19 (emphasis added).]  The ALJ did not conclude Plaintiff had *no* limitations caused by his mental health impairment.  [AR 19-20.]  Nevertheless, Plaintiff contends that the ALJ did not include a discussion of any "minimal" limitations caused by Plaintiff's mental impairment in the residual functional capacity assessment and did not state how any such limitations impacted his ability to work.  As a result, Plaintiff contends the ALJ failed to meet his burden of proving at step five that there is work Plaintiff can perform in the national economy.  Therefore, Plaintiff argues that the case should be remanded for further proceedings.  [Doc. No. 9-1 at 7, 12-15.]

SSA regulations state that a residual functional capacity assessment must consider all of a claimant's "medically determinable impairments . . . , including [the claimant's] medically determinable impairments that are not 'severe.'"  20 C.F.R. § 404.1545(a)(2). SSA regulations further state that a disability analysis must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. . . .  [T]he combined impact of the impairments will be considered throughout the disability determination process." 20 C.F.R. § 404.1523.

The residual functional capacity assessment must address the claimant's exertional capacity (*i.e.*, the length of time the claimant is able to sit, stand, walk, carry, push and pull) and nonexertional capacity (*i.e.*, stooping, climbing, reaching, handling, seeing, hearing, and speaking).  SSR 96-8P, 1996 WL 374184, at *5-6.  The assessment must also address mental limitations and restrictions:  "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  *Id.* at *6.

If it is determined as a result of the residual functional capacity assessment at step four that a claimant cannot do any of his "past relevant work," then "the same

1  assessment" of the claimant's "residual functional capacity" is used at step five to

2  determine if the claimant "can adjust to any other work that exists in the national

3  economy."  20 C.F.R. §§ 404.1545(a)(5)(ii), 404.1520(g)(1).  At this step of the analysis,

4  certain vocational factors must also be considered to determine whether the claimant can

5  adjust to other work.  These factors include the claimant's age, education, and work

6  experience.  20 C.F.R. § 404.1520(g)(1).

7        "[A] conclusion that the claimant's mental impairments are non-severe at step two

8  does not permit the ALJ simply to disregard those impairments when assessing a

9  claimant's [residual functional capacity] and making conclusions at steps four and five.

10 In his [residual functional capacity assessment], the ALJ must consider the combined

11 effect of *all* medically determinable impairments, whether severe or not."  *Wells v.*

12 *Colvin*, 727 F.3d 1061, 1068-69 (10th Cir. 2013).  "'The mental [residual functional

13 capacity] assessment used at steps 4 and 5 of the sequential evaluation process requires a

14 more detailed assessment by itemizing various functions contained in the broad

15 categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of

16 the Listing of Impairments'" (*i.e.*, activities of daily living; social functioning;

17 concentration, persistence, or pace; and episodes of decompensation).  *Id.* at 1069

18 (quoting SSR 96-8P, 1996 WL 374184, at *4).

19       Here, the ALJ's residual functional capacity assessment includes a detailed

20 discussion of Plaintiff's exertional and nonexertional capacities that relate to his "severe"

21 physical impairments (*i.e.*, "degenerative disc disease of the lumbar spine and status-post

22 disc replacement").  [AR 19, 22-23.]  Based on the evidence, the ALJ concluded Plaintiff

23 was restricted to light work with a number of physical restrictions and limitations.  [AR

24 22-23.]

25       With respect to mental capacity, the ALJ acknowledged in his decision that "[t]he

26 mental residual functional capacity assessment at steps 4 and 5 of the sequential

27 evaluation process requires a more detailed assessment by itemizing various

28 functions. . . .  Therefore, the following residual functional capacity assessment reflects

the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." [AR 20-21.]  However, the ALJ's decision does not include any analysis as to how Plaintiff's ability to function in a work setting is affected by his "mild limitations" in mental functioning in the areas of daily living, social functioning, and concentration, persistence, and pace. [AR 20.]  For example, the ALJ's decision does not indicate how or if Plaintiff's "mild limitations" [AR 20] in mental functioning affect his ability to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  SSR 96-8P, 1996 WL 374184, at *6.  As a result, it is not possible to determine whether the ALJ actually considered any such "mild limitations" in Plaintiff's mental functioning as part of his residual functional capacity assessment.  [AR 20-25.]

There is evidence in the medical treatment records suggesting that Plaintiff's mood was "well-managed," and he felt better with medication and therapy, but that he still had times when he was unable to sleep and felt "stressed," irritable, and/or anxious.  [AR 484, 450, 452, 568-69, 865-66.]  In addition, there is testimony by the vocational expert suggesting that the outcome of the case could have been different if the ALJ's analysis considered "the combined impact" of all Plaintiff's "severe" physical impairments (*i.e.*, his degenerative disc disease of the lumbar spine and status-post disc replacement) and his "non-severe" mental impairment (*i.e.*, his "mild limitations" in mental functioning). 20 C.F.R. § 404.1523; [AR 20-25; 51-53.]  For example, the vocational expert indicated that all work would be eliminated for an individual who is limited to light work but has "difficulty maintaining attention and concentration."  [AR 51-52.]  In addition, the vocational expert testified that the position of cashier would be unavailable to an individual who is unable to interact with the public and is only able to interact occasionally with co-workers and supervisors.  The vocational expert further testified that the position of bench assembler could be eliminated for an individual who is unable to handle the stress of a "production based quota."  [AR 52-53.]

Based on the foregoing, this Court cannot conclude that the ALJ's residual functional capacity assessment at steps four and five of the disability analysis is supported by substantial evidence and/or free from legal error.  The ALJ's residual functional capacity assessment at steps four and five is incomplete.  As a result, the ALJ did not meet his burden of establishing at step five of the disability analysis that Plaintiff had the residual functional capacity to perform work available in the national economy.  The assessment does not clearly address the combined effect of all of Plaintiff's "medically determinable impairments . . . , including [his] medically determinable impairments that are not 'severe.'"  20 C.F.R. §§ 404.1545(a)(2), 404.1523.  Specifically, the ALJ concluded at step two that Plaintiff had "mild limitations" in daily living, social functioning, concentration, persistence, and/or pace [AR 20], but his decision does not include any analysis as to how these "mild limitations" in mental functioning impacted the residual functional capacity assessment at steps four and five of the disability analysis.

### C.   *Plaintiff's Pain Testimony.*

Plaintiff testified that the artificial disc in his back causes "[a] lot of pain." [AR 37.]  He also testified that he takes medications for pain, including Vicodin, Ibuprofen, Tylenol, and Flexeril.  [AR 38.]  In addition, Plaintiff testified that he must change positions regularly about every five to forty minutes to relieve pain depending on the medication he takes.  [AR 40.]  As summarized above, Plaintiff's medical treatment records indicate that he is being treated for chronic back pain that is managed but not completely controlled by medication.  [AR 314, 393-96, 434-52, 567-69, 572, 865-66.]

"Pain of sufficient severity . . . may provide the basis for determining that a claimant is disabled."  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  "[A] claimant need not present clinical or diagnostic evidence to support the severity of his pain."  *Id.*  In turn, an ALJ may not reject "excess pain testimony" based solely on a lack of objective medical support in the record.  *Id.* at 792-93.

The Ninth Circuit has explained:

> In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.' If the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give 'specific, clear and convincing reasons' in order to reject the claimant's testimony about the severity of the symptoms. At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).' In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.' For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, [such as] . . . 'whether the claimant engages in daily activities inconsistent with the alleged symptoms.' While a claimant need not 'vegetate in a dark room' in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting. Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

*Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012).

Although the issue is not specifically addressed in Plaintiff's moving papers, it is unclear from the ALJ's decision whether and to what extent Plaintiff's claims of chronic pain impacted the residual functional capacity assessment at steps four and five of the disability analysis. [AR 21-25.] The ALJ's decision includes several conclusory statements about Plaintiff's overall symptoms. First, the decision states that he "considered all symptoms" to the extent they were consistent with the objective medical evidence. [AR 21.] Second, the decision states that Plaintiff's "subjective complaints are less than fully credible and the objective medical evidence does not support the alleged severity of symptoms." [AR 24.] Third, the ALJ's decision states that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the

1   reasons explained in this decision." [AR 23]

2        The ALJ's decision does specifically address the limiting effects of Plaintiff's

3   physical symptoms caused by his back condition, including "decreased range of motion;

4   mild spasm and tenderness; an audible clunk with hip flexion and with lumbar spine

5   flexion; . . . and an abnormal gait." [AR 22.] As a result of these physical symptoms, the

6   ALJ concluded Plaintiff "would have been restricted to light exertional work and

7   occasional postural activities." [AR 22.] The ALJ also concluded Plaintiff should be

8   precluded from "ladders, ropes, or scaffolds, and unprotected heights or dangerous

9   machinery." [AR 22.]

10        On the other hand, the ALJ's decision does not specifically address any limiting

11   effects of Plaintiff's claims of chronic pain from his back condition. [AR 22-25.] The

12   vocational expert testified that representative jobs in the light exertional category (*i.e.*,

13   cashier, officer worker, and bench assembler) would be eliminated for an individual who

14   had to change positions frequently to address back pain. [AR 51, 53.] Since the ALJ

15   concluded Plaintiff had the residual functional capacity to perform these representative

16   jobs in the national economy, it is apparent that he rejected Plaintiff's pain testimony.

17   [AR 25, 51, 53.] However, this Court was unable to discern clear and convincing reasons

18   in the ALJ's decision to support a complete rejection of this testimony. *Molina*, 674 F.3d

19   at 1112. Therefore, it is this Court's view that the ALJ did not meet his burden of

20   establishing at step five of the disability analysis that Plaintiff has the residual functional

21   capacity to perform available work in the national economy. For this additional reason,

22   this Court cannot conclude that the ALJ's residual functional capacity assessment at steps

23   four and five of the disability analysis is supported by substantial evidence and/or free

24   from legal error.

25   **VI.   *Conclusion*.**

26        Based on the foregoing, this Court concludes that the ALJ's residual functional

27   capacity assessment at steps four and five of the disability analysis is not free from legal

28   error or supported by substantial evidence in the Administrative Record. First, the ALJ's

decision is incomplete, because it does not include an analysis as to how Plaintiff's ability to function in a work setting is affected by his "mild limitations" in mental functioning.  [AR 21-25.]  Second, the ALJ's decision is incomplete because it is apparent that the ALJ rejected Plaintiff's claims of chronic pain but did not provide clear and convincing reasons for doing so.  [AR 22-25.]  A decision to remand for further investigation and development of the record is appropriate when outstanding issues remain that must be resolved before a determination of disability can be made.  *Treichler v. Comm'r of Social Sec. Admin.*, 775 F.3d 1090, 1106-07 (9th Cir. 2014).  Accordingly,

**IT IS HEREBY ORDERED THAT:**

1.     Plaintiff's Motion for Summary Judgment [Doc. No. 9] is **GRANTED** to the extent it seeks a remand for further proceedings;

2.     Defendant's Cross-Motion for Summary Judgment [Doc. No. 14] is **DENIED**;

3.     The matter is **REMANDED** to the Commissioner for further consideration, investigation, and development of the record consistent with this Order; and

4.     Judgment shall be entered in Plaintiff's favor.

**IT IS SO ORDERED.**


Dated:  August 29, 2016

Hon. Roger T. Benitez
United States District Judge